STATE

v.

Alfred BISHOP.

No. 77–453–C.A.

Supreme Court of Rhode Island.

Jan. 6, 1982.

Dennis J. Roberts, II, Atty. Gen., David H. Leach, Asst. Atty. Gen., for plaintiff.

Paul J. DiMaio and Joni Seplocha, Providence, for defendant.

## OPINION

WEISBERGER, Judge.

This case comes before us on appeal from a judgment of conviction of murder in the first degree entered in the Superior Court on May 28, 1975. The defendant has also appealed separately from subsequent Superior Court rulings denying two motions for new trial on grounds of newly discovered evidence. The first denial of a motion for new trial after judgment of conviction was entered on November 2, 1979; the second denial was entered May 6, 1980. We affirm. The facts upon which the conviction was based are as follows.

On December 3, 1973, at about 11:15 p. m., James Dunn was watching television at his residence at 178 Long Street in Warwick. Suddenly he was struck by a series of shotgun blasts which shattered the window and portions of the wooden shutters adjacent to the window of the room where he was seated. Dunn slumped to the floor; as he did so, Linda DeFusco, his girl friend, who had been lying on the couch asleep, suddenly awakened and saw his plight. Miss DeFusco called the Warwick Rescue Squad and then went to the side of the victim, who asked her to call the rescue agency a second time because, he said, he knew that he was dying. Miss DeFusco complied with this request, and shortly thereafter both the police and rescue personnel arrived at Dunn's home.

Officer White of the Warwick police department later testified that Dunn said, upon Officer White's arrival, " 'I'm dying, ain't I?' " and requested that a priest be summoned. Thereafter, Officer White testified that Dunn told him that he had been shot by Freddie Bishop, whom he saw through the window after the first shot was fired. Dunn made similar statements within the hearing of John Chappell, a member of the rescue squad, Captain Mulhearn of the Warwick police department, and Nurse Hammond who later ministered to Dunn at the emergency room of the Kent County Memorial Hospital. Dunn was pronounced dead at 12:40 a. m., December 4, 1973.

The subsequent autopsy disclosed that the victim had sustained four gunshot wounds, one each in the jaw, right arm, left arm, and a major wound in the lower back. The fatal shot was that which entered the lower back and exited through his abdomen.

Officers of the Warwick police department discovered shotgun shells on the ground below the broken window. Soon after, a bulletin was broadcast by the Warwick police department ordering the arrest of Alfred Bishop, and since Bishop did not

drive, instructions were also included stating that he might be found as a passenger in one of several described vehicles driven by one of two named persons. At 1:45 a. m., Bishop was apprehended in an automobile driven by Thomas Firth on Post Road in Warwick.

After their arrest, Thomas Firth and Alfred Bishop were transported to the Warwick police station where their clothing was seized and sent to the laboratories of the Federal Bureau of Investigation (FBI) in Washington, D. C. Alfred Bishop was later charged with first-degree murder in an indictment by a Kent County grand jury. His trial, which began with jury selection on November 12, 1974, and ended on December 12, 1974, resulted in a verdict of guilty of murder in the first degree. A motion for new trial was filed and denied on April 14, 1975. The defendant was sentenced to life imprisonment on May 28, 1975. Subsequent motions for new trial were denied on November 2, 1979, and May 6, 1980.

In support of his appeal, defendant raises seven issues. We shall deal with these issues in the order in which they were raised in defendant's brief. Additional facts pertinent to each issue will be supplied as required.

I

IS DEFENDANT DENIED HIS RIGHT TO EFFECT AN APPEAL BY REASON OF THE ALLEGED LOSS OF PORTIONS OF THE TRIAL COURT RECORD?

Under this heading defendant makes a number of rather vague claims that "various portions of the trial court record and proceedings are lost or otherwise unavailable for review." An examination of the record presented to this court indicates beyond any doubt that the entire transcript of testimony given at the trial itself and the record of the first motion for new trial have been furnished and made available at state expense to defendant and his counsel as well as to this court. It should be noted

that defendant was represented by Charles Rogers, Jr., Esquire, during the trial and during the first motion for new trial. Thereafter, at subsequent motions for new trial, defendant was represented by John Cicilline, Esquire. He is represented on appeal by Paul DiMaio, Esquire. At oral argument appellate counsel suggested that portions of the trial transcript might be missing. Our inquiry and examination of the five volumes of the trial transcript clearly indicate that no portion of the trial transcript is missing and that the five volumes constitute a complete transcript of all the evidence set forth at the trial. The only portion of the record not furnished to this court appears to be that of the evidentiary hearing held in support of the new trial motion that was filed on October 21, 1977, and denied on November 2, 1979. At oral argument counsel for defendant was unable to state with any degree of certainty whether a transcript of this evidentiary hearing had been ordered by his predecessor counsel and, if ordered, whether it had been in fact delivered. The state's brief contains in its appendix one page of what appears to be a posttrial examination of Dr. Wendell Coston, and FBI technical expert who testified at the trial concerning scientific testing of the clothing of defendant and of Thomas Firth. Also defendant has included in the appendix to his brief the trial justice's written decision on said motion. Assuming, without deciding, that appellate counsel desired a copy of the evidentiary portion of that hearing on motion for new trial, we cannot find any contention or assertion that he unsuccessfully applied to the court stenographer who recorded such hearing for such a transcript. In this connection it should be further noted that on June 26, 1975, the trial justice granted leave to defendant to appeal *in forma pauperis*. Therefore, all transcripts furnished were without charge to defendant or to his attorney. Consequently, there seems to be no basis for the contention that defendant was denied any portions of any transcript which he or his counsel should find to be necessary or desirable in the prosecution of his appeal.

Additionally defendant claims that a number of exhibits that were introduced at the trial are now missing as a result of their having been introduced into evidence at the trial of Thomas Firth, who was also charged with the murder of James Dunn. The only exhibit to which the defendant specifically refers in his brief is a newspaper article published in the Evening Bulletin on November 13, 1974, and in the Providence Journal on November 14, 1974. Although defendant claims that he was unable to obtain a copy of this article, the state's brief sets forth in its appendix a copy of an article which purports to be that to which defendant has made reference. A comparison of this article with descriptions and quotations from the transcript establishes beyond doubt that this is the article of which complaint is made. The defendant offered no explanation either in his brief or at oral argument for his failure to obtain a copy of this article from the Providence Journal or from the assistant attorney general who tried the case. A complete list of all exhibits introduced at the trial is set forth in volume I of the trial transcript furnished to counsel and to this court.

Absent a demonstration of inability to obtain a particular exhibit, which is required to support a contention raised on appeal, we are of the opinion that defendant has established no factual predicate in support of this issue.

II

DID THE TRIAL JUSTICE COMMIT PREJUDICIAL ERROR IN DENYING DEFENDANT'S MOTION FOR MISTRIAL AS A RESULT OF PRETRIAL PUBLICITY?

The jury selection process began on November 12, 1974. On November 13 and 14, 1974, identical newspaper articles that defendant asserts were prejudicial appeared in the Evening Bulletin and The Providence Journal. Although defendant in his brief states that he is unable to present the news article to this court for review, the state attached to its brief a copy of the article in question which was apparently marked as defendant's exhibit No. 1 for identification in support of the motion for mistrial. An examination of this article discloses that its subject matter dealt in a general way with the adequacy of the then new court facility which had been made available for use by various judicial agencies in the county of Kent. A portion of the article dealt with the subject of security. This portion made reference to a murder trial going on in a third-floor courtroom and the method of transporting the suspect each day from the correctional institution to the courthouse and to the room in which the trial was to be conducted. A statement was made that the life of the prisoner had been threatened. At no point in the article was defendant's name mentioned, nor was there any statement relative to the facts of the alleged crime or any reference made to any matter that might relate to the guilt or innocence of the accused.

Thereafter, at the request of counsel for defendant, the trial justice questioned the members of the jury panel about whether they had read the article. The jurors indicated that they had read the article but that it did not affect their ability to render an impartial verdict in the case. The trial justice was convinced after reading the article that it in no way caused any prejudice to defendant and that its only effect might be to "invoke some sympathy for the defendant on the part of the jury, and therefore prejudice the State's case."

Our examination of the article also indicates that it would require a most strained interpretation to find a quantum of prejudice, in respect to this article, which could reasonably support a motion for mistrial. We have stated in State v. Patriarca, 112 R.I. 14, 24, 308 A.2d 300, 308 (1973), that the type of publicity which will warrant a mistrial requires a concurrence of factors sufficient to establish the possibility of irreversible prejudice in the minds of the jurors, which prejudice will deprive defendant of due process. The article in this case so closely bordered upon the innocuous as to make the jurors' disclaimer of prejudice and

lack of impartiality most credible. Thus the trial justice's finding of no prejudice was eminently reasonable and in no respect constituted prejudicial error.

## III

### DID THE TRIAL JUSTICE COMMIT REVERSIBLE ERROR IN FAILING TO REQUIRE THE RECORDING OF BENCH CONFERENCES?

■ In his brief, defendant contends that the trial justice committed prejudicial error in failing to record over one hundred bench conferences allegedly conducted outside the hearing of the jury. The defendant does not point to any request by trial counsel that such bench conferences be recorded. Further, defendant does not purport to suggest what the subject of these bench conferences might have been, or the fashion in which the failure to record any or all of them might have been prejudicial to him.

Recently in *State v. D'Alo*, R.I., 435 A.2d 317 (1981), we made the following observation concerning the recording of bench conferences:

"Bench conferences frequently serve to permit the court and counsel to resolve some nonevidentiary matter, such as housekeeping problems with exhibits or difficulties with witness availability or other rather inconsequential procedural questions. When a bench conference involves resolution of such nonmaterial matters, stenographic recording is clearly unnecessary. Occasionally, however, the court may also resolve more serious matters at the side bar, such as evidentiary objections or objections to the judge's jury instructions. Although it is within the discretion of the trial justice to allow or not to allow counsel to raise such ma-

terial matters at bench conferences, when convenience and efficiency are served thereby, such conferences may be allowed and should be recorded." *Id.*, 435 A.2d at 321.

We went on to hold, however, that in order for a defendant to prevail on the issue of nonrecording of bench conferences, he must at least set forth the matters allegedly raised and the manner in which he was prejudiced by the fact that the bench conferences were not recorded. *Id.* In the case at bar, as in *State v. D'Alo, supra,* defendant has failed to set forth either the matters raised or any assertions pointing to prejudice.[1] In the posture in which this issue is presented, we are of the opinion that defendant has failed to meet the threshold requirements in order to support his contention.

## IV

### DID THE TRIAL JUSTICE COMMIT REVERSIBLE ERROR BY ADMITTING EVIDENCE RELATING TO THE CLOTHING OF THOMAS FIRTH?

The trial justice admitted expert testimony concerning glass particles found in the clothing of Thomas Firth which matched particles of glass found at the murder scene. Similar evidence was also introduced in respect to particles of glass found in the clothing of defendant which also matched particles collected at the murder scene. The defendant contends that the evidence concerning the Firth clothing was inadmissible on the ground of lack of relevancy and also on the ground that said evidence had been illegally obtained.

Considering first the relevancy claim, we note that *McCormick's Handbook of the Law of Evidence,* § 185 at 434–35 (2d ed.

---

1. The defendant suggests one specific example of an off-the-record discussion that was not recorded. Apparently during the course of deliberation, the jurors asked for a reading by the court stenographer of the testimony of two witnesses (Messrs. Griffin and Muto). In accordance with this request on the morning of December 12, 1974, the trial justice directed the court stenographer to read back the requested testimony. An examination of the transcript indicates that there was no objection by either counsel to the reading of the testimony. Although the original request of the jury has not been preserved, the statement of the trial justice clearly indicates that the response was in accordance with that original request. Thus, no issue was raised at the trial in respect to this reading back of testimony, which could possibly constitute a basis for appellate review.

Cleary 1972), defines relevant evidence as evidence that tends to prove or disprove a fact that is provable in the case. *Accord, State v. Santos*, R.I., 413 A.2d 58, 69 (1980); 1 Wigmore, *Evidence*, §§ 9–12 (3d ed. 1940). The text further suggests that in order to be admissible, an item of evidence "cannot be expected by itself to furnish conclusive proof of the ultimate fact to be inferred." *McCormick's Handbook of the Law of Evidence* at 436. *See United States v. Pugliese*, 153 F.2d 497, 500 (2d Cir. 1945).

 In the case at bar, it was material to prove that defendant had been at the scene of the crime at the time the shotgun blasts had occurred. It was also an undisputed fact in the case that defendant did not drive. Consequently, an important element of proof had to consist of the means by which defendant was transported to and from the Dunn residence. Therefore, the location of Thomas Firth at the scene of the crime at the time of the shooting became an important subsidiary fact to be proven in order to complete the comprehensive edifice of direct and circumstantial evidence. Certainly, the determination by the trial justice that this evidence was relevant was well within the bounds of his discretion. *See State v. Camerlin*, 116 R.I. 726, 729, 360 A.2d 862, 865 (1976); *State v. Verdone*, 114 R.I. 613, 617, 337 A.2d 804, 808 (1975); *State v. Mastracchio*, 112 R.I. 487, 491, 312 A.2d 190, 193 (1973).

 The second ground in support of this issue is that the clothing seized from Thomas Firth was illegally obtained. *See State v. Firth*, R.I., 418 A.2d 827 (1980). Although this assertion may be true, it is of no benefit or avail to this defendant. The Supreme Court of the United States has set forth on numerous occasions that only one whose right to privacy has been violated may invoke the exclusionary rule in challenging the admissibility of evidence that has been illegally obtained. *United States v. Payner*, 447 U.S. 727, 731, 100 S.Ct. 2439, 2444, 65 L.Ed.2d 468, 474, *reh. denied*, 448 U.S. 911, 101 S.Ct. 25, 65 L.Ed. 1172 (1980); *Brown v. United States*, 411 U.S. 223, 230, 93 S.Ct. 1565, 1569, 36 L.Ed.2d 208, 214 (1973); *Alderman v. United States*, 394 U.S. 165, 171–72, 89 S.Ct. 961, 965–66, 22 L.Ed.2d 176, 186 (1969); *Wong Sun v. United States*, 371 U.S. 471, 492, 83 S.Ct. 407, 419, 9 L.Ed.2d 441, 458 (1963). Consequently, defendant substantially concedes in his brief that he had no basis upon which to challenge an illegal search or seizure in respect to Thomas Firth. He then makes a general claim that, nevertheless, he has been prejudiced by the admission of such "fruit of the poisonous tree." He next asserts that if evidence is illegally obtained, it cannot be used for any purpose whatsoever. In advancing this proposition, defendant ignores the central thrust of the requirement of standing. As the Court pointed out in *Alderman v. United States, supra*, suppression of evidence cannot be urged by those who are aggrieved solely because such evidence would be used against them in the trial of a criminal case. Consequently, this contention is without merit.

## V

DID THE TRIAL JUSTICE COMMIT REVERSIBLE ERROR IN DENYING DEFENDANT'S MOTION FOR NEW TRIAL ON THE GROUND THAT AN EXPERT WITNESS HAD MISLED THE COURT?

 On October 21, 1977, defendant filed a motion for new trial on the ground of newly discovered evidence. After hearing argument and testimony in support of this motion, the trial justice denied the same on November 2, 1979. The factual basis for the motion was as follows.

At trial the state presented an expert witness, Dr. Wendell Coston, a Special Agent of the FBI, in order to present testimony concerning testing that the FBI had done on glass particles collected at the murder scene and later compared with glass particles removed from defendant's clothing and that of Thomas Firth. At trial the witness had stated, *inter alia*, that he had a bachelor's degree, a master's degree, and a doctorate in geology from the University of Arkansas. He further stated that he had

been employed by the FBI from the time of his graduation to the time of the trial and that for the immediate past two and a half years preceding the trial he had been in the FBI Laboratories, specifically the mineralogy unit where his work included examination of glass and soil samples. He testified concerning training given to him in the laboratory and especially in the technique of examining such samples. After the conclusion of the witness's testimony concerning his qualifications, counsel for defendant stipulated to his expertise and declined to cross-examine on that issue.

As a result of testimony at the hearing on the motion for new trial and at the Thomas Firth trial, it was disclosed that Dr. Coston's degrees from the University of Arkansas consisted of a bachelor's degree in the field of geology, a master's degree in soil classification, and a doctorate in clay mineralogy. It was disclosed that he did not have a doctorate in geology because the University of Arkansas at the time of his attendance did not offer a doctorate in geology. Doctor Coston explained, however, that he considered his academic credits to be in the field of geology, namely that subfield of geology which constitutes clay mineralogy. The trial justice found that although the Coston doctorate had been earned in clay mineralogy, his education, training and experience qualified him as an expert in the field about which he had given evidence. The trial justice also expressed the opinion that had defendant's attorney not stipulated to the qualifications of the witness, his specific training and experience would have been further developed for consideration. In sum, the trial justice determined that the testimony concerning the nature of witness Coston's degree in no way affected his competence to give the testimony at trial, nor would it have significantly affected the witness's credibility. Since the trial justice found the field of clay mineralogy to be a subfield of the general field of geology, the distinction between the nomenclature of degrees was of no substantial difference. Therefore, the trial justice's denial of the motion for new trial on this ground was amply supported by the evidence.

VI

SHOULD A NEW TRIAL HAVE BEEN GRANTED BECAUSE OF LATER EVIDENCE OF THE POSSIBLE CONTAMINATION OF SPECIMENS EXAMINED BY FBI AGENT COSTON?

During the trial of Thomas Firth, cross-examination disclosed notations on certain worksheets. These notations indicated that particles of glass from known sources had been poorly packaged and spilled out of their containers onto some of the exhibits. When questioned about this contamination, Dr. Coston stated that whenever there appeared to be a possibility of contamination of a sample, that sample would not be examined and was kept from the other exhibits that were examined. Doctor Coston stated during the course of the Firth trial, "If there is any slightest possibility of contamination of the evidence by the known source of glass, no examinations were made at all." The defendant contends that the trial justice committed error in denying his motion for new trial based upon the possibility of contamination of evidence at the Bishop trial as a result of Dr. Coston's testimony and notes in the Firth trial.

No transcript of testimony in support of the motion for new trial has been furnished. However, the decision of the trial justice filed November 2, 1979, has been appended to defendant's brief. This decision unequivocally states as a finding of fact "that no contaminated evidence was used against the defendant." This finding is dispositive of the issue.

■ It is well established that the prosecution has a constitutional duty to disclose to defendant any evidence which might be favorable to the accused on either the issue of guilt or punishment. *United States v. Agurs*, 427 U.S. 97, 106, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342, 351 (1976); *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, 108 (1972); *Giles v. Mary-*

*land*, 386 U.S. 66, 73–74, 87 S.Ct. 793, 797, 17 L.Ed.2d 737, 744 (1967); *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218 (1963). The Supreme Court pointed out, however, in *United States v. Agurs, supra*, that a failure of the prosecution to provide information will not give rise to a defendant's right to a new trial unless the omitted evidence creates a reasonable doubt that did not otherwise exist. Only under those circumstances would constitutional error have been committed. Moreover, the alleged omission must be evaluated in the context of the entire record. *United States v. Agurs*, 427 U.S. at 112–14, 96 S.Ct. at 2401–02, 49 L.Ed.2d at 354–55.

■ In the case at bar, as in *Agurs*, the trial justice found that no reasonable doubt in light of the entire record could have been predicated upon the possibility of contamination of evidentiary samples which were not examined and which were not used against defendant in any way. The trial court also found that the state did not have actual knowledge of the possibility of contamination and further, that this possibility did not relate to any of the evidence actually submitted. Moreover, the court determined that the possibility of contamination in respect to samples which were not examined and used in evidence was so remote and irrelevant to the evidence submitted that the FBI had no obligation to report this to the Warwick police or to the attorney for the state. The trial justice concluded by finding that there was no suppression of evidence "deliberate, inadvertent or otherwise which would be favorable or exculpatory to the defendant * * *."

This finding was amply supported by the full record of both the Bishop and the Firth trials. Therefore, it could scarcely be contended that the finding of the trial justice was clearly wrong. Consequently, no action or omission by the state deprived defendant of a fair trial as guaranteed by the due-process clause of the Fourteenth Amendment.

## VII

## DID THE TRIAL JUSTICE ERR IN DENYING, ON MAY 6, 1980, A DEFENSE MOTION FOR NEW TRIAL BASED ON ALLEGEDLY NEWLY DISCOVERED EVIDENCE?

■ On December 11, 1979, defendant filed a third motion for new trial based upon allegedly newly discovered evidence. The contentions raised in this motion were that a portion of the medical examiner's report indicated that injuries to the jaw of the murder victim were such that he could not have spoken as witnesses for the state testified he did. The defendant also asserted in the motion for new trial that he had ingested a poisonous substance on the day preceding his testimony, which action rendered him incapable of receiving a fair trial. The state objected to this motion on two grounds. First, under Rule 33 of the Superior Court Rules of Criminal Procedure, a motion for a new trial "may be made only before or within two (2) years after entry of judgment by the court * * *." Second, the state objected on the ground that the evidence to which reference was made was either known or available to be known at the time of trial and, therefore, did not qualify as newly discovered evidence. The trial justice held that the motion was filed out of time, since judgment of conviction had been entered on May 28, 1975, more than two years prior to the filing of the motion for new trial. The trial justice noted that Federal Rule 33 and Rhode Island Rule 33 differed in that Federal Rule 33 provides that a motion for new trial based on the ground of newly discovered evidence may be made before or within two years after *final* judgment. Thus, cases construing the federal rule are not persuasive. *See, e.g., Smith v. United States*, 283 F.2d 607 (D.C.Cir.1960). The trial justice was persuaded by two Kentucky cases that construed language similar to that contained in our Rule 33 as requiring that the motion for new trial based on grounds of newly discovered evidence be measured for timeliness from the date of the original judgment. *See Polsgrove v. Commonwealth*, 439

S.W.2d 776, 780 (Ky.App.1969); *Bell v. Commonwealth*, 395 S.W.2d 784, 785 (Ky. App.1965).

We are of the opinion that the decision of the trial justice was correct. In adopting the rules of criminal procedure, the Superior Court has significantly extended the period of time during which a motion for new trial might be made on the ground of newly discovered evidence. Previous to adoption of Rule 33, motions for new trial on any available ground, including newly discovered evidence, were required to be made within ten days after verdict. General Laws 1956 (1969 Reenactment) § 9–23–1 (repealed by P.L. 1972, ch. 169, § 9). This provision was extended to some extent by § 9–21–6 (repealed by P.L. 1972, ch. 169, § 7), which allowed the Supreme Court, within one year of entry of judgment, to allow a motion for new trial to be made upon the ground, among others, of newly discovered evidence. The reporter's notes to Rule 33 stated in part:

> "Rule 33 would permit the motion for new trial on this ground to be made in the Superior Court within two years of entry by that court of judgment pursuant to Rule 32 * * *."

Rule 32(b) reads as follows:

> "Judgment. A judgment of conviction shall set forth the offense charged, the plea, the verdict or findings, and the adjudication and sentence. If the defendant is found not guilty or for any reason is entitled to be discharged, judgment shall be entered accordingly. The judgment shall be signed by the judge and entered by the clerk."

Rule 32(b) clearly contemplates that judgment will be entered immediately after imposition of sentence, as was done in this case, without awaiting the outcome of the appellate process. Indeed, the judgment signed by the judge and entered by the clerk on May 28, 1975, constitutes the judgment from which an appeal is taken in accordance with Rule 4(b) of the Supreme Court Rules of Appellate Procedure.

In any event, under Rhode Island law, a defendant is not precluded from asserting a claim based upon newly discovered evidence even under circumstances in which the time for filing a motion for new trial has expired. General Laws 1956 (1969 Reenactment) § 10–9.1–1(4), as enacted by P.L. 1974, ch. 220, § 3, makes available a postconviction remedy without limitation in regard to time in the event that the defendant establishes a factual basis similar to that which underlies a motion for new trial on the ground of newly discovered evidence. *Danahey v. State*, 118 R.I. 268, 274–75, 373 A.2d 489, 491–92 (1977); *State v. Lanoue*, 117 R.I. 342, 346, 366 A.2d 1158, 1160 (1976). Since the trial justice correctly found the motion to have been filed out of time and since he did not reach the merits concerning whether the evidence was in fact newly discovered, we too shall not address the merits of the factual assertions and will limit ourselves to sustaining the trial justice's procedural determination.

For the reasons stated, the defendant's appeal is denied and dismissed. The judgment of conviction is affirmed. The papers in the case may be remanded to the Superior Court.

SHEA, J., did not participate.